OPINIONS OF THE SUPREME COURT OF OHIO
     The full texts of the opinions of the Supreme Court of
Ohio are being transmitted electronically beginning May 27,
1992, pursuant to a pilot project implemented by Chief Justice
Thomas J. Moyer.
     Please call any errors to the attention of the Reporter's
Office of the Supreme Court of Ohio.  Attention:  Walter S.
Kobalka, Reporter, or Deborah J. Barrett, Administrative
Assistant.  Tel.:  (614) 466-4961; in Ohio 1-800-826-9010.
Your comments on this pilot project are also welcome.
     NOTE:  Corrections may be made by the Supreme Court to the
full texts of the opinions after they have been released
electronically to the public.  The reader is therefore advised
to check the bound volumes of Ohio St.3d published by West
Publishing Company for the final versions of these opinions.
The advance sheets to Ohio St.3d will also contain the volume
and page numbers where the opinions will be found in the bound
volumes of the Ohio Official Reports.

The State of Ohio, Appellee, v. Campbell, Appellant.
[Cite as State v. Campbell (1994),      Ohio St.3d     .]
Criminal law -- Aggravated murder -- Death penalty upheld, when.
     (No. 91-2137 -- Submitted October 13, 1993 -- Decided
April 20, 1994.)
     Appeal from the Court of Appeals for Hamilton County, No.
C-890330.
     Appellant, Jerome Campbell, convicted of the aggravated
murder of Henry Turner, appeals his convictions and death
sentence.
     Turner lived in an apartment at 1008 York Street,
Cincinnati.  Campbell had formerly lived in the same apartment
building as Turner and had been in Turner's apartment, but had
moved out about two months before the murder.
     On December 23, 1988, Turner's neighbor, Leon Callins,
visited Turner and left at 8:00 p.m.  The next morning, Callins
found Turner lying dead, a knife sticking through his wrist.
Callins called the police.
     The police found Turner's apartment in disarray.  Dresser
drawers were lying on the floor.  Items lay jumbled on the
bedroom and living room floors.  Turner's mattress had been
pulled off the bed frame, and his television lay facedown on
the floor.  Turner's normally locked liquor cabinet was open.
According to Callins, Turner kept a neat apartment, and the
mess had not been there the night before.  Police found a set
of knives in an open drawer in Turner's kitchen; the murder
weapon was apparently taken from that drawer.
     Police also found Campbell's fingerprint and palm print at
the crime scene.  The fingerprint was on a light bulb found on
the floor just outside Turner's apartment.  The palm print was
on the outside surface of the door leading from the hallway
into Turner's kitchen, directly above the lock.
     In an autopsy examination, a deputy Hamilton County
coroner found two stab wounds in Turner's chest and a "through
and through stab wound of the right wrist"; i.e., the knife had
been plunged all the way through Turner's wrist.  Turner also
had a half-inch-deep cut on the chin and a defense wound on his
left thumb.

Donna Roberts lived at 1010 York Street. She knew Campbell as "Scar Face" or "Burnt Face," nicknames deriving from the burn scars covering one side of his face. Around 11:00 p.m. on December 23, while walking to a local bar, Roberts saw someone in an alley between 1010 York and 1008 York. She did not see the person's face, but said he or she wore white jogging pants.

About two hours later, Roberts was walking home along York Street, which required her to pass an alley separating 1008 York from a vacant building. Passing the alley, Roberts was startled to see Campbell standing in the alley, just inches away from her. Campbell was wearing dark pants and held what might have been a bottle. Roberts said, "[H]ow you doing?" Campbell said, "Hi."

On December 30, Officer Camden and Specialist Rowland of the Cincinnati police arrested Campbell at his sister's apartment and later interrogated him at the police station. An interrogating police officer stated that Campbell admitted the burglary but denied the murder. Campbell also said that he had never changed a light bulb at 1008 York, except in his own apartment.

After the police took Campbell away, his sister let them search her apartment. (Campbell disputes the voluntariness of her consent.) In a closet, officers found a pair of gym shoes stained with human blood. Under a bed, they found an empty Bacardi rum bottle. A code number on the label matched the number on a Bacardi bottle found in Turner's apartment. Records of the Castleton Beverage Corporation (which makes Bacardi) showed that all bottles with that code had gone in one shipment to Covington, Kentucky.

Campbell's ex-girlfriend, Estella "Niecy" Roe, visited him in the Hamilton County Jail as he awaited trial. During one visit, Campbell admitted to Roe that "he did it" (he later recanted) and asked her to lie for him. Later, Campbell sent Roe a letter postmarked January 23, 1989, setting forth a detailed alibi for Roe to testify to. Unwilling to lie for Campbell, Roe gave the letter to police.

Ronys Clardy and Angelo Roseman, both convicted felons, were in jail at the same time. Both later testified that Campbell admitted to them that he had murdered Turner. Campbell mentioned to both Clardy and Roseman that he had seen a woman, presumably Donna Roberts, outside the apartment house after the murder. Campbell told Roseman he was afraid the woman might be able to identify him.

The jury convicted Campbell of aggravated murder, R.C. 2903.01(B) (felony-murder), a felony-murder specification, R.C. 2929.04(A)(7), and two counts of aggravated burglary, R.C. 2911.11(A)(1) and (A)(3). After a penalty hearing, Campbell was sentenced to death. The court of appeals affirmed.

The cause is before this court upon an appeal as of right.


Gloria Eyerly, Ohio Public Defender, Jane P. Perry and Joseph Wilhelm, Assistant Public Defenders, for appellant.

Joseph T. Deters, Hamilton County Prosecuting Attorney, and Christian J. Schaefer, Assistant Prosecuting Attorney, for appellee.

Pfeifer, J.  In this appeal, Campbell advances thirty propositions of law.  For the reasons that follow, we affirm Campbell's convictions and death sentence.

## I
## Waiver and Plain Error

Most of the issues Campbell now seeks to raise were not preserved by objection at trial.  "It is a general rule that an appellate court will not consider any error which counsel for a party complaining of the trial court's judgment could have called but did not call to the trial court's attention at a time when such error could have been avoided or corrected by the trial court."  State v. Childs (1968), 14 Ohio St.2d 56, 43 O.O.2d 119, 236 N.E.2d 545, paragraph three of the syllabus.  Such errors are waived.1

Under Crim.R. 52(B), we have power to recognize "[p]lain errors or defects involving substantial rights * * * although they were not brought to the attention of the court."  However, this rule may be invoked only in rare cases.  Thus, an alleged error "does not constitute a plain error or defect under Crim.R. 52(B) unless, but for the error, the outcome of the trial clearly would have been otherwise."  State v. Long (1978), 53 Ohio St.2d 91, 7 O.O.3d 178, 372 N.E.2d 804, paragraph two of the syllabus.2

## II
## Presentence Investigation

In his twenty-ninth proposition of law, Campbell contends that the court committed reversible error by ordering a presentence investigation report ("PSI") that the defense did not request.3

After the guilt phase, defense counsel said: "Your honor, we would like not to have a presentence investigation * * * ."  The penalty phase was tried without a PSI, resulting in the jury's recommendation of death.  After the jury was discharged, the trial judge told counsel:  "I would like to order a presentence investigation and report."  Campbell did not object, and the PSI was compiled.  At the subsequent sentencing hearing, defense counsel stated:

"Your honor, first, if it please the Court, I would indicate that both Mr. Krumbein [defense co-counsel] and I have reviewed the presentence investigation that was ordered by the Court.  There are no statements that can be added, no corrections, that I can see that need to be mentioned on the record."

When the judge pronounced sentence, he said that he had "made an independent review of, and considered all of the relevant evidence raised at trial, including the testimony, exhibits, other evidence and arguments of counsel, along with, now, the presentence investigation * * * ."

The PSI cited a police officer's opinion "that this was a very brutal offense committed against an elderly, helpless man and that the defendant should receive a maximum sentence."  The PSI also related the officer's opinion "that some of the wounds  * * * appeared to be torture wounds."

But Campbell never objected to the PSI's compilation or consideration.  Under State v. Long, he must show plain error by showing that the sentence would clearly have been otherwise but for the error.  Yet, the circumstances indicate that the

PSI had little effect on the sentence. While the judge said that he considered the PSI, he cited no specific aspect of it that impressed him. Indeed, he did not deem the PSI worth mentioning in his subsequent written opinion.

Moreover, though the judge considered the PSI, we see no reason to presume that he gave weight, or even credence, to everything in it. Specifically, we see no evidence that the judge's sentencing decision was affected by the officer's opinion regarding "torture wounds." The officer was not qualified to render such an opinion, and we think it likely that this experienced trial judge understood that. And, while Campbell characterizes the officer's opinion as "inflammatory," we recognize that judges are not easily swayed by irrelevant emotional responses.

Campbell's criminal record was also in the PSI. However, the mitigating factor of R.C. 2929.04(B)(5), lack of a significant criminal record, was absent in this case with or without the PSI, since Campbell did not attempt to prove that mitigating factor. See, e.g., State v. Waddy (1992), 63 Ohio St.3d 424, 449, 588 N.E.2d 819, 838.

Finally, we note that both the jury and the court of appeals unanimously found beyond a reasonable doubt that the aggravating circumstance outweighed the mitigating factors, even though neither group ever saw the PSI.4 That is significant, for Campbell must show that the trial judge clearly would have sentenced him to life but for the PSI. We can hardly be certain of that, since twelve jurors and three appellate judges found that Campbell deserved a death sentence without seeing the PSI.

"Notice of plain error * * * is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." Long, supra, paragraph three of the syllabus. It is far from clear that justice has been miscarried here, and so we cannot find plain error. Accordingly. we hold the PSI issue waived and overrule Campbell's twenty-ninth proposition.

In his twenty-first proposition of law, Campbell recasts the PSI issue in Sixth Amendment terms. Campbell claims he did not receive the effective assistance of counsel, because counsel did not object when the trial court ordered the PSI.

A defendant who claims ineffective assistance must show deficient performance by counsel and resulting prejudice. Strickland v. Washington (1984), 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674, 693. The performance inquiry requires the court to ask whether, considering all the circumstances, "counsel's representation fell below an objective standard of reasonableness." Id. at 688, 104 S.Ct. at 2064, 80 L.Ed.2d at 693. The court "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." Id. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. The prejudice inquiry "is whether there is a reasonable probability that, absent the errors, the factfinder would have" acquitted the defendant or, in a capital case, spared him a death sentence. Id. at 695, 104 S.Ct. at 2068-2069, 80 L.Ed.2d at 698. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at

698.

Significantly, the judge did not order the PSI until after discharging the jury.  Campbell had already been convicted by the jury.  His only chance was to persuade the judge to reject the jury's recommendation on the basis of the same evidence that had already failed to sway the jury.  When the judge erroneously ordered the PSI, counsel could have "logically decide[d] to take the chance that a PSI may produce something [favorable] he had missed * * *."  State v. Hutton (1990), 53 Ohio St.3d 36, 42, 559 N.E.2d 432, 441.  And, a competent attorney might well have wanted the judge to see the PSI even though he had not wanted the jury to see it.  Counsel could reasonably assume that the judge would be unaffected by any inflammatory material in the PSI, since a judge is legally presumed to consider only relevant, competent, material evidence.  State v. Post (1987), 32 Ohio St.3d 380, 384, 513 N.E.2d 754, 759.

Campbell further argues that counsel should have objected to the inclusion of Officer Zieverink's inflammatory statements in the PSI.  But only the trial judge saw the PSI, and that same judge would have performed any redaction.  It was objectively reasonable for counsel not to request redaction, since the judge would see the entire PSI -- redacted or not.

### III
### Fourth Amendment Issues

In his second and twelfth propositions of law, Campbell claims police illegally searched his sister Pamela's apartment.  He therefore contends that the trial court should have suppressed the items found in the apartment.  However, Campbell withdrew his motion to suppress the fruits of the search during the suppression hearing.  Hence, the threshold question is whether Campbell waived his challenge to the search's legality.

We find that he did.  By failing to file a motion to suppress illegally obtained evidence, a defendant waives any objection to its admission.  State v. Wade (1978), 53 Ohio St.2d 182, 7 O.O.3d 362, 373 N.E.2d 1244, paragraph three of the syllabus, vacated on other grounds (1978), 438 U.S. 911, 98 S.Ct. 3138, 57 L.Ed.2d 1157; State v. F.O.E. Aerie 2295 (1988), 38 Ohio St.3d 53, 526 N.E.2d 66, paragraph two of the syllabus.  Obviously the same result occurs when a motion is filed but later withdrawn.

Campbell, however, argues that withdrawing the motion should not be deemed a waiver, because the trial court illegally forced him to choose between two constitutional rights.  When Campbell testified at the suppression hearing, the prosecutor asked him whether he was near Turner's residence on the night of December 23.  Defense counsel objected, but the trial court overruled the objection.  Only then did defense counsel withdraw the motion.

Campbell argues that the trial court, by overruling his objection, forced him to withdraw the motion in order to avoid self-incrimination.  We disagree.  Answering the prosecutor's question could not have incriminated Campbell, because "when a defendant testifies in support of a motion to suppress evidence on Fourth Amendment grounds, his testimony may not thereafter be admitted against him at trial on the issue of guilt * * *."

Simmons v. United States (1968), 390 U.S. 377, 394, 88 S.Ct. 967, 976, 19 L.Ed.2d 1247, 1259.

Campbell also argues that his counsel rendered ineffective assistance by withdrawing the motion. Campbell speculates that counsel did not know Campbell's suppression testimony was inadmissible at trial.

However, counsel's decision "was reasonable considering all the circumstances." Strickland, 466 U.S. at 688, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. First, even though Campbell's hearing testimony was inadmissible in the state's case-in-chief, the court might have allowed its use to impeach Campbell if he later chose to testify at trial. See United States v. Salvucci (1980), 448 U.S. 83, 93-94, 100 S.Ct. 2547, 2554, 65 L.Ed.2d 619, 629; 4 LaFave, Search and Seizure (2 Ed. 1987) 240-242, Section 11.2(d), and 349-351, Section 11.3(g); 1 Hall, Search and Seizure (2 Ed. 1991) 244-245, Section 5:42. Second, Campbell's testimony might have led the state to the discovery of other evidence against him. Of course, the defense could have objected that such evidence was "fruit of the poisonous tree," but that would have been hard to prove; defense counsel could have reasonably decided to play it safe by withdrawing the motion. To speculate, as Campbell urges, that counsel simply did not know the law is inconsistent with the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance * * *." Strickland, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694. We therefore reject Campbell's ineffective-assistance argument.

IV

Fifth Amendment Issues

In his ninth proposition of law, Campbell contends his statements were inadmissible because police did not advise him of his rights, as required by Miranda v. Arizona (1966), 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694. But the trial judge denied the motion to suppress statements, implicitly finding that the police gave the Miranda warnings.

The record of the suppression hearing supports this finding. Specialist Kerry Rowland testified that Officer Ron Camden read Campbell's rights from a form printed on Camden's pocket calendar, which the state placed in evidence. Campbell said he understood his rights, was willing to talk, and had nothing to hide. Campbell testified that the officers gave no warnings, but the trial court evidently believed Rowland. We defer to its findings, as we must. See State v. Mills (1992), 62 Ohio St.3d 357, 366, 582 N.E.2d 972, 982; State v. Waddy, supra, 63 Ohio St.3d at 430, 588 N.E.2d at 825.

Campbell also argues that his waiver was the product of police "trickery," hence involuntary. According to Campbell, police arrested him on an unrelated rape charge, obtained his Miranda waiver without telling him that he would also be questioned about the murder, and interrogated him about the rape before bringing up the murder. However, the record of the suppression hearing does not support Campbell's allegation that he was arrested for rape. It is true that Officer Camden so testified at trial, but Campbell did not ask the trial court to reconsider its ruling in light of Camden's trial testimony, and we decline to hold that a trial court "erred in not

reconsidering its suppression ruling sua sponte." Govt. of Virgin Islands v. Hernandez (C.A.3, 1975), 508 F. 2d 712, 714, fn.3. See, also, 4 LaFave, Search and Seizure (2 Ed. 1987) 521, Section 11.7(c).

Even were we to consider Camden's trial testimony, we could not find Campbell's Miranda waiver involuntary. "[A] suspect's awareness of all the possible subjects of questioning in advance of interrogation is not relevant to determining whether the suspect voluntarily, knowingly, and intelligently waived his Fifth Amendment privilege." Colorado v. Spring (1987), 479 U.S. 564, 577, 107 S.Ct. 851, 859, 93 L.Ed.2d 954, 968.

Campbell claims that the police conduct amounted to an implied "affirmative misrepresentation" of the interrogation's scope. Spring, 479 U.S. at 576, 107 S. Ct. at 858, 93 L.Ed.2d at 967, fn. 8. To begin with, it is unclear how an implied misrepresentation could ever be an affirmative one. But that need not detain us, for this case so closely resembles Spring as to make any "affirmative misrepresentation" finding inconceivable. In Spring, federal agents arrested a suspected murderer on firearms charges. He waived his rights, and the agents questioned him on the firearms charges before asking about the murder. 479 U.S. at 566-569, 107 S.Ct. at 853-854, 93 L.Ed.2d at 961-962. The Spring court found no misrepresentation, and we see no basis for finding one here.

Campbell also argues that counsel rendered ineffective assistance because they did not specifically argue that Campbell's Miranda waiver was obtained by "trickery." (See proposition of law twenty-one.) However, we cannot call counsel ineffective for overlooking this weak argument.

V

Sufficiency of Evidence

In his tenth proposition of law, Campbell argues that the evidence was insufficient to support a conviction. He contends that the state failed to prove both that he killed Turner and that he harbored a purpose to kill. Neither claim has merit.

When a defendant challenges the sufficiency of the evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis sic.) Jackson v. Virginia (1979), 443 U.S. 307, 319, 99 S.Ct 2781, 2789, 61 L.Ed.2d 560, 573.

The state's evidence, if believed, would allow a rational trier of fact to find guilt. Campbell's fellow jail inmates, Clardy and Roseman, testified that Campbell admitted killing Turner. Campbell attacks their credibility, but we may not "substitute our evaluation of witness credibility for the jury's." State v. Waddy, supra, 63 Ohio St.3d at 430, 588 N.E.2d at 825. Moreover, Campbell made a similar admission to Estella Roe.

Campbell also asked Roe to provide him with a false alibi. This strongly indicates consciousness of guilt. See Cleveland v. McNea (1952), 158 Ohio St. 138, 142, 48 O.O. 68, 70, 107 N.E.2d 201, 203. Accord 2 McCormick on Evidence (4 Ed. 1992) 190, Section 265; 2 Wigmore on Evidence (Chadbourn Rev. 1979 and 1991 Supp.) 133, 137, Section 278(2).

Donna Roberts positively identified Campbell as the man she saw lurking in the alley next to 1008 York Street on the night of December 23. Campbell argues that Roberts could have been mistaken, but that is a jury question. Waddy, supra. Finally, Campbell's fingerprint was on the light bulb outside Turner's apartment; his palm print was on Turner's door; and his shoes were stained with blood.

Campbell also argues that the state failed to prove purpose to kill. But Turner was stabbed four times in or near vital areas (see discussion of third proposition of law, infra), which does not suggest an accidental or reflexive stabbing. We overrule Campbell's tenth proposition.

## VI
## Guilt-Phase Instructions

Campbell's third, fourth, fifth, and sixth propositions of law, and a supplemental proposition filed by leave of court on October 1, 1993, allege errors in the guilt-phase instructions.

## A
## Lesser Included Offense

At trial, Campbell asked the trial court to instruct on involuntary manslaughter as a lesser included offense of aggravated murder. The court refused. In his third proposition of law, Campbell argues that this refusal is reversible error.

Involuntary manslaughter, R.C. 2903.04, is a lesser included offense of aggravated murder. State v. Thomas (1988), 40 Ohio St.3d 213, 533 N.E.2d 286, paragraph one of the syllabus. "The primary difference" between the two is that aggravated murder requires purpose to kill, while involuntary manslaughter requires only a killing as a proximate result of a felony. State v. Jenkins (1984), 15 Ohio St.3d 164, 218, 15 OBR 311, 357, 473 N.E.2d 264, 310.

Thus, an involuntary manslaughter instruction is justified "only when, on the evidence presented, the jury could reasonably find against the state on the element of purposefulness and still find for the state on the defendant's act of killing another." Thomas, 40 Ohio St.3d at 216, 533 N.E.2d at 289. The court must view the evidence in the light most favorable to the defendant. State v. Wilkins (1980), 64 Ohio St.2d 382, 388, 18 O.O.3d 528, 532, 415 N.E.2d 303, 308.5

Turner's wounds show a purposeful killing. The killer inflicted four wounds in or near vital areas: two in the chest, one in the chin, and one in which the killer drove his blade all the way through Turner's wrist. (Campbell claims the wrist is not a vital area. We disagree.) These wounds refute Campbell's claim that he stabbed Turner "reflexively * * * without purpose to kill and only so he could get away."

Nor does the evidence suggest that Turner was killed in a struggle over the knife, as Campbell argues. The coroner testified that one wound -- a cut on Turner's thumb -- was "a defense wound. It is postulated [i.e., assumed] to occur as a result of a struggle over the weapon. * * * Either a struggle or an attempt to ward off." That assumption does not explain Turner's four other wounds.

Campbell claims he entered Turner's apartment unarmed and without purpose to kill. The evidence supports this claim, for

Turner was apparently killed with one of his own kitchen knives. However, the issue is not what Campbell intended when he broke in, but what he intended when he stabbed Turner. The state did not allege, and did not have to prove, prior calculation and design.

Even when the evidence is viewed in the light most favorable to Campbell, the number and location of his victim's wounds would compel any reasonable trier of fact to find intent to kill. Therefore, an involuntary manslaughter instruction would have been improper. We overrule Campbell's third proposition of law.

B

Other Guilt-Phase Instructions

Campbell's other allegations of guilt-phase instructional error also center on the issue of purpose. In his fourth proposition of law, Campbell argues that the trial court erred in defining "purpose" to the jury. According to Campbell, the trial court's definition of "purpose" allowed the jury to find purpose without finding, as R.C. 2903.01(D) requires for a conviction, that the defendant "specifically * * * intended to cause * * * death." Similarly, in his fifth proposition of law, Campbell contends that the trial court gave a confusing instruction on causation and foreseeability that may have allowed the jury to convict without finding specific intent to kill. See State v. Burchfield (1993), 66 Ohio St.3d 261, 263, 611 N.E.2d 819, 820-821 (dictum). In his sixth proposition of law, Campbell argues that the jury could have interpreted an instruction as a directed verdict on one element of aggravated burglary.

Finally, in a supplemental proposition of law, Campbell claims the trial court erred by instructing that purpose "is determined from the manner in which [an act] is done, the means or weapon used, and all the other facts and circumstances * * * ." According to Campbell, this allowed the jury to presume (not merely infer) purpose to kill from the use of a weapon.

Campbell failed to object to these instructions at trial and therefore must show that the trial's outcome would clearly have been different but for the alleged errors. State v. Long, supra. In our view, the challenged instructions did not demonstrably determine the outcome. The trial court also expressly instructed: "No person may be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another." (Emphasis added.) Further, the judge said: "It must be established * * * that at the time in question there was present in the mind of the defendant a specific intention to kill Henry Turner * * *." (Emphasis added.) And immediately after the instruction at issue in the supplemental proposition, the trial court instructed that "purpose to kill may be inferred" from the use of a deadly weapon to inflict wounds "in a manner calculated to destroy life or inflict great bodily harm * * *." (Emphasis added.)

Campbell concedes that it is "impossible to determine" whether the jurors applied these concededly correct instructions. Therefore, we cannot say that the jury would clearly have acquitted Campbell had the challenged instructions not been given, especially since there was strong evidence of specific intent to kill. (See discussion of third proposition

of law, supra.)  Campbell argues that any uncertainty should be resolved in his favor, but that would be inconsistent with plain error analysis.  Finding no plain error, we treat these propositions as waived and need not reach their merits. Campbell's fourth, fifth, sixth, and supplemental propositions are therefore overruled.

Campbell also contends that his counsel rendered ineffective assistance by not objecting to the instructions on purpose, causation, and foreseeability (see proposition of law twenty-one).  However, counsel could reasonably have thought the trial court's strong instructions on specific intent to kill were sufficient to protect their client.  Moreover, given the evidence of purpose, the alleged instructional errors do not undermine our confidence in the verdict.  Campbell has therefore failed to show "a reasonable probability that, but for counsel's [failure to object], the result of the proceeding would have been different."  Strickland, 466 U.S. at 694, 104 S.Ct at 2068, 80 L.Ed.2d at 698.

## VII
## Improper Testimony

In his first proposition of law, Campbell claims the trial court erred by allowing the following testimony regarding Campbell's interrogation:

"A  [Officer Camden] * * * I made the statement to [Campbell] that I felt he had committed burglaries before with people in the house asleep.  At that point he says, yeah, I did.  And then he said * * * that he believed he was committing burglaries in this case[.] * * * I told him the only difference was -- is that this time Turner woke up and he killed him.

"Q  [Prosecutor] Did he deny that?

"A  He denied that."

The state argues that Campbell waived this issue by not raising it in the court of appeals.  We agree.  See Toledo v. Reasonover (1965), 5 Ohio St.2d 22, 34 O.O.2d 13, 213 N.E.2d 179; State v. Jones (1965), 4 Ohio St.2d 13, 33 O.O.2d 90, 211 N.E.2d 198.  We therefore apply the plain error rule.  See State v. Broom (1988), 40 Ohio St.3d 277, 281, 533 N.E.2d 682, 689.  Here, the other evidence of guilt was so strong that we cannot say Campbell would clearly have been acquitted but for Camden's testimony.  Hence, we find no plain error and treat the issue as waived.

## VIII
## Gruesome Photographs

In his eleventh proposition of law, Campbell challenges the admission of gruesome photographs and slides.  In a capital case, such photographs are admissible if the probative value of each one outweighs its danger of material unfair prejudice and the photos are not repetitive or cumulative.  State v. Maurer, (1984), 15 Ohio St.3d 239, 15 OBR 379, 473 N.E.2d 768, paragraph seven of the syllabus.

The court of appeals held any error waived, and for the most part we agree.  However, in objecting to the slides, Campbell argued that they "would just be repetitive" of the photos.  He thus preserved his objection to State's Exhibit 13 (photo) and 28A (slide), which are indeed repetitive.  Since they are also gruesome (both exhibits show the knife in Turner's wrist), it was error to admit both.  However, we see

no prejudice in a single repetition of a highly relevant image.  We find the error harmless.

## IX
### Relevance of Forensic Testimony

Forensic serologist Denise Cargo testified for the state, giving her expert opinion that Campbell's shoes were stained with human blood.  In his seventh proposition of law, Campbell argues that Cargo's testimony was irrelevant, because she could not draw any further conclusions (e.g., blood type) from the stains.  But Campbell's arguments go to weight, not relevance.  Obviously, human bloodstains on Campbell's shoes make it somewhat likelier that he stabbed someone.  See Evid.R. 401.

Campbell also argues that Cargo's testimony should have been excluded under Evid. R. 403(A) because the jurors may have been so impressed by her expertise that they overrated her testimony's value.  However, such speculation does not justify silencing relevant testimony.

## X
### Cumulative Evidence

While testifying, Estella Roe read aloud Campbell's letter urging her to lie for him.  The letter itself was later admitted as State's Exhibit 25.  In his eighth proposition of law, Campbell argues that the letter should have been excluded as cumulative.  However, Evid.R. 403(B) does not require exclusion of cumulative evidence.  The court has discretion to admit or exclude it.  We find no abuse of discretion and hence overrule this proposition.

## XI
### Prosecutorial Misconduct

In his thirteenth proposition of law, Campbell claims that prosecutorial misconduct denied him a fair trial in both phases.  However, Campbell failed to object at trial, waiving any but plain error.  We find no plain error.  Many of the alleged errors were quite minor, and many were offset by instructions from the trial court.  In no case can we find that the alleged errors were so prejudicial that the outcome of the trial or sentencing hearing would clearly have been otherwise had they not occurred.  Hence, the matters raised in Campbell's thirteenth proposition are waived, and we need not reach their merits.

Campbell's twentieth proposition of law alleges that prosecutorial misconduct on voir dire affected the jury's penalty phase deliberations.  Campbell objected to none of the alleged misconduct; thus, he waived the issue absent plain error.  The alleged misconduct is subtle, involving particular choices of word or phrase.  To find plain error, we would have to assume that, after a trial on guilt or innocence and a penalty phase featuring arguments by counsel and instructions from the judge, the jury's sentencing recommendation was determined by something the prosecutor said in voir dire.  That strikes us as implausible.  See Darden v. Wainwright (1987), 477 U.S. 168, 183-184, 106 S.Ct. 2464, 2472-2473, 91 L.Ed.2d 144, 158-159, fn. 15.

## XII
### Penalty-Phase Instructions

In his fourteenth proposition of law, Campbell claims the trial court erred by refusing to instruct the jury that it

could consider mercy during the penalty phase.  This proposition lacks merit.  See State v. Lorraine (1993), 66 Ohio St.3d 414, 417-418, 613 N.E.2d 212, 216-217.

In his fifteenth proposition of law, Campbell contends that the penalty-phase instructions were erroneous.  However, at trial Campbell neither submitted proposed instructions nor objected to the court's instructions.  See Crim.R. 30(A).  Campbell's objections are therefore waived and cannot be the basis for reversal.  We overrule Campbell's fifteenth proposition.

## XIII
### Other Penalty-Phase Issues

The trial court sentenced Campbell to death on Count One of the indictment (aggravated murder) and to a prison term on Count Two (aggravated burglary), to be served "consecutive to Count One."  In his seventeenth proposition of law, Campbell argues that the trial court could not make a prison sentence consecutive to a death sentence.  While the prison sentence is rendered moot by the imposition of the death sentence, we find no error.  Cf. State v. Brown (1988), 38 Ohio St.3d 305, 317-318, 528 N.E.2d 523, 538-539.

In his eighteenth proposition of law, Campbell attacks the trial court's weighing of the aggravating circumstance and mitigating factors.  First, Campbell complains that the trial court weighed "nonstatutory aggravating circumstances" against him.  We disagree.  Although the sentencing opinion refers several times to "aggravating circumstances,"  the trial judge understood perfectly well that there was only one aggravating circumstance: indeed, he specifically identified it in his opinion.  The opinion correctly states that the aggravating circumstance was the commission of aggravated murder "while the defendant was committing aggravated burglary."

## XIV
### Ineffective Assistance

In his twenty-first proposition of law, Campbell charges his trial counsel with ineffective assistance, listing thirteen alleged errors.  We have analyzed several of these claims above; here, we turn to those not already discussed.

Campbell argues that counsel should have raised several objections during voir dire and trial.  But, "failure to object to error, alone, is not enough to sustain a claim of ineffective assistance * * *."  State v. Holloway (1988), 38 Ohio St.3d 239, 244, 527 N.E.2d 831, 837.  Because "[o]bjections tend to disrupt the flow of a trial, [and] are considered technical and bothersome by the fact-finder," Jacobs, Ohio Evidence (1989), at iii-iv, competent counsel may reasonably hesitate to object in the jury's presence.

Campbell claims counsel should have objected to the trial court's reasonable doubt instruction and to the instruction that the jury's penalty-phase verdict was a "recommendation."   However, it was reasonable not to object.  See State v. Nabozny (1978), 54 Ohio St.2d 195, 8 O.O.3d 181, 375 N.E.2d 784, vacated on other grounds (1978), 439 U.S. 811, 99 S.Ct. 70, 58 L.Ed.2d 103, and State v. Hicks (1989), 43 Ohio St.3d 72, 79-80, 538 N.E.2d 1030, 1038-1039.  Accordingly, his twenty-first proposition is overruled.

In his twenty-second proposition of law, Campbell accuses

his appellate counsel of ineffective assistance because they did not raise twenty-six issues in the court of appeals.

Counsel need not raise all nonfrivolous issues on appeal. Jones v. Barnes (1983), 463 U.S. 745, 751, 103 S.Ct. 3308, 3312-3313, 77 L.Ed.2d 987, 993. Campbell's counsel raised thirteen assignments of error in the court of appeals. Counsel could have reasonably decided they could not add twenty-six more issues without "burying good arguments * * * in a verbal mound made up of strong and weak contentions." 463 U.S. at 753, 103 S.Ct. at 3313, 77 L.Ed.2d at 994. Moreover, several issues on Campbell's list were waived at trial, and some were precluded by settled law. Others may have had arguable merit, but are "sufficiently problematical that the refusal to raise them cannot be assailed as an unreasonable professional judgment." Cunningham v. Henderson (C.A.2, 1984), 725 F.2d 32, 36.

XV

Settled Issues

In his nineteenth proposition of law, Campbell complains that the trial court overruled his motion for individual, sequestered voir dire. However, the court had discretion to voir dire prospective jurors as a group. State v. Mapes (1985), 19 Ohio St.3d 108, 114-115, 19 OBR 318, 323-324, 484 N.E.2d 140, 146; State v. Brown, supra, paragraph two of the syllabus. Campbell also argues that the court should have explained why it denied the motion. But Campbell has the burden to show abuse of discretion. Mapes, supra, at 115, 19 OBR at 324, 484 N.E.2d at 146. Trial courts need not disprove abuse by explaining every discretionary decision.

Propositions of law twenty-three through twenty-eight resurrect well-settled issues and are summarily overruled. See State v. Poindexter (1988), 36 Ohio St.3d 1, 520 N.E.2d 568; State v. Spisak (1988), 36 Ohio St.3d 80, 521 N.E.2d 800. Moreover, Campbell concedes that propositions twenty-three and twenty-five were not preserved at trial, and we also find that the issue raised in proposition twenty-six was not raised at trial. These propositions are waived.

XVI

Independent Sentence Review

Having affirmed Campbell's conviction, we review his death sentence de novo for appropriateness and proportionality. Campbell relies on two mitigating factors: his "history, character, and background," R.C. 2929.04(B), and residual doubt of guilt, see State v. Watson (1991), 61 Ohio St.3d 1, 572 N.E.2d 97. 6

When Campbell was five, his face was badly scarred in a fire. He was in the hospital for a year. Psychologist David Chiappone testified that this affected Campbell profoundly. At age five, "you're trying to get from your parents a sense of faith in the outside world." Campbell's long hospitalization distorted "that normal developmental path," and he began to feel that others saw him "for his scars, not for himself."

Later events reinforced Campbell's alienation. Having been hospitalized so long, he was held back in school, and his schoolmates made fun of his scars. To relieve feelings of inadequacy and anger, Campbell drank and took drugs, which kept him from "develop[ing] * * * other mechanisms to deal with

[his] feelings * * *."

However, Chiappone also testified that Campbell told him "that he received numerous treatments up until age 14 * * * or 15 at which point they were going to have plastic surgery. But he said * * * he felt he adjusted to it and he didn't accept the plastic surgery."

Chiappone apparently did not believe Campbell, but our duty is to independently weigh the evidence. While we respect Chiappone's professional opinion, Campbell's own words are the most persuasive evidence of his state of mind. That is especially true given the context in which Campbell spoke: Chiappone was examining him to see whether his psychological state might yield mitigating factors to help him avoid the death penalty. And, Campbell's actions corroborate his words; he did, after all, refuse the plastic surgery.

Moreover, Campbell's sister Pamela was also scarred in the fire and hospitalized for a year; she too was ridiculed as a child. Yet she is a law-abiding citizen. Cf. Waddy, 63 Ohio St.3d at 452, 588 N.E.2d at 839. On these facts, we cannot give much weight to the possibility that Campbell's crimes are "attributable to * * * emotional and mental problems," making him "less culpable than defendants who have no such excuse." California v. Brown (1987), 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934, 942 (O'Connor, J., concurring).

As to residual doubt, Campbell points out that the fingerprints outside Turner's apartment could have been placed there anytime; that the blood on Campbell's shoes was unidentifiable; and that the door to the apartment building was not forced, yet Campbell apparently had no key to that door.

However, Campbell's claims of innocence are unpersuasive. He tried to fabricate an alibi, hardly the act of an innocent man. His fingerprint was on the light bulb outside Turner's apartment, and he admitted that he never changed the light bulbs in public areas of the building when he lived there. He told Estella Roe, Ronys Clardy, and Angelo Roseman that he had killed Turner. And Donna Roberts saw him lurking in an alley outside the apartment building on the night of the murder.

Campbell attacks Roberts' identification at great length. He says the lighting was dim, but Roberts did not so testify; although the streetlamp was across the street from her, she said its light illuminated the alley. Besides, she was just inches from Campbell, a man with a distinctively scarred face whom she already knew.

Campbell points out that Roberts was coming home from a bar when she saw him, but we reject his insinuation. Roberts testified without contradiction that she was at the bar only briefly and had nothing to drink that night.7 Campbell also claims that Roberts admitted not paying attention to who was around, but what she really said was that she had not been paying attention until seeing Campbell in the alley:

"Q. [Defense counsel] And the reason you got startled is because even up to that point you weren't paying attention to who was around, correct?

"A. [Roberts] Right.

"Q. And at that point when you first saw somebody like that, you got startled?

"A. Yeah, I jumped and grabbed my heart because it scared

me."

Finally, Campbell argues that police tainted Roberts' identification by showing her Campbell's picture alone instead of in a photo array. But Roberts already knew Campbell. Thus, her identification of him is highly reliable. See State v. Parker (1990), 53 Ohio St.3d 82, 87, 558 N.E.2d 1164, 1169. On this record, residual doubt deserves no mitigating weight.

Against the mitigating factors, we must weigh the aggravating circumstance of murder committed during aggravated burglary. The mitigating factors are weak, and we find that the aggravating circumstance outweighs them beyond a reasonable doubt. The death sentence is therefore appropriate.

We also find the death sentence proportionate compared to sentences approved or disapproved by this court in similar capital cases. In similar cases of burglary-murder, we have affirmed death sentences in the face of far stronger mitigation. For instance, in State v. Holloway, supra, 38 Ohio St.3d 239, 527 N.E.2d 831, the defendant was deformed and retarded. In childhood he was not only taunted, but beaten by other children -- and teased by his family and teachers as well. Psychologists testified that he lacked substantial capacity to appreciate the criminality of his conduct or conform to the law. 38 Ohio St.3d at 245-246, 527 N.E.2d at 838. Campbell presented no such psychological testimony here.

Similarly, in State v. Murphy (1992), 65 Ohio St.3d 554, 605 N.E.2d 884, the defendant was only twenty-one and had been "the victim of verbal, physical and sexual abuse as a child * * *." Id. at 585, 605 N.E.2d at 908. His intelligence was in the bottom six or seven percent of the population. Id. Yet, Murphy received a death sentence for a similar crime, the murder of an elderly victim during an invasion of her home. It is true that Murphy was convicted of two capital specifications, robbery-murder and burglary-murder; unlike Campbell, he succeeded in robbing his victim. But we do not think that difference so significant as to warrant a lighter punishment for Campbell.

Finding the death penalty appropriate and proportionate, we affirm the sentence of death. The judgment of the court of appeals is therefore affirmed.

                          Judgment affirmed.

Moyer, C.J., Douglas and Resnick, JJ., concur.

F.E. Sweeney, J., concurs in judgment only.

A.W. Sweeney and Wright, JJ., concur in part and dissent in part.

FOOTNOTES

1 A more precise term would be "procedurally defaulted." See, e.g., Engle v. Isaac (1982), 456 U.S. 107, 129, 71 L.Ed.2d 783, 801, 102 S.Ct. 1558, 1572. However, we have usually described failures to object and similar procedural defaults as "waivers," even though they are not the kind of waivers described in Johnson v. Zerbst (1938), 304 U.S. 458, 464, 82 L.Ed. 1461, 1466, 58 S.Ct. 1019, 1023.

2 Campbell cites In re M.D. (1988), 38 Ohio St.3d 149, 527 N.E.2d 286, syllabus, for the proposition that we may review waived issues even where the alleged error does not amount to plain error. But in M.D., there was no waiver; the appellant had raised her due process claim at trial via motion to

dismiss.  38 Ohio St.3d at 151, 527 N.E.2d at 287-288.

Although we sometimes discuss the merits of a waived proposition of law as an alternative basis for rejecting it, that is consistent with the plain error rule.  See Harris v. Reed (1989), 489 U.S. 255, 264, 109 S.Ct. 1038, 1044, 103 L.Ed.2d 308, 318, fn. 10.  Our cases make clear that we will not overturn a conviction for alleged error not raised below, unless it amounts to plain error.  See, e.g., State v. Coleman (1988), 37 Ohio St.3d 286, 294, 525 N.E.2d 792, 800 (arguments not preserved below "cannot be considered"); State v. Greer (1988), 39 Ohio St.3d 236, 244, 530 N.E.2d 382, 394.

3 R.C. 2929.03(D)(1) provides that, in capital cases, "[a] pre-sentence investigation * * * shall not be made except upon request of the defendant."

We note that Campbell was convicted of non-capital felonies as well as capital crimes.  In sentencing Campbell on the non-capital crimes, the judge was required to obtain a PSI.  Crim.R. 32.2(A).  However, the judge did not limit his use of the PSI to the non-capital felonies; he also considered it in sentencing Campbell to death.  Cf. State v. Cooey (1989), 46 Ohio St.3d 20, 33-34, 544 N.E.2d 895, 912-913 (victim impact statement was not error where used only in sentencing on non-capital crimes) with State v. Cook (1992), 65 Ohio St.3d 516, 528-529, 605 N.E.2d 70, 83-84 (improperly ordered PSI was error where trial judge considered it in sentencing defendant to death).

4 The PSI was missing from the record when it went to the court of appeals, but has since been restored.  See State v. Campbell (1992), 63 Ohio St.3d 1447, 589 N.E.2d 390 (granting motion to supplement record).

5 We therefore do not consider the testimonies of Roseman or Clardy, though they support a finding of intent, since a reasonable trier of fact could have disbelieved those witnesses.

6 At trial, Campbell also argued that his youth was mitigating, but he was twenty-seven at the time of the offense.  Accordingly, the R.C. 2929.04(B)(4) mitigating factor does not apply.  See State v. Rojas (1992), 64 Ohio St.3d 131, 143, 592 N.E.2d 1376, 1387; State v. Carter (1992), 64 Ohio St.3d 218, 228, 594 N.E.2d 595, 602.

7 Roberts met her sister and a friend at the bar, and they decided to go to Roberts' sister's house.  The three spent an hour to ninety minutes there, talking; then Roberts' friend drove her back to the bar.  Roberts was there less than a minute; she walked in, turned, and walked right back out.

A.William Sweeney, J., concurring in part and dissenting in part.    While I concur in the reasoning of Parts I through XV of the majority opinion, I am constrained to dissent from the majority's independent review of the death penalty sentence.  In my view, whether the aggravating circumstance outweighs the mitigating factor of defendant's psychological problems is such a close call that I cannot subscribe to the majority's conclusion that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. Psychologist David Chiappone submitted compelling evidence that the burns and scars endured by defendant as a child are largely responsible for his antisocial behavior and drug/alcohol abuse problems.  Thus, I believe that defendant's antisocial behavior

is in part "attributable to *** emotional and mental problems," making him "less culpable than defendants who have no such excuse."  California v. Brown (1987), 479 U.S. 538, 545, 107 S.Ct. 837, 841, 93 L.Ed.2d 934, 942 (O'Connor, J., concurring).

Accordingly, I would hold that the aggravating circumstance does not outweigh mitigation beyond a reasonable doubt, and therefore reverse the death penalty and remand for resentencing under State v. Penix (1987), 32 Ohio St.3d 369, 513 N.E.2d 744.

Wright, J., concurs in the foregoing opinion.